*439 Opinión disidente emitida por la
Jueza Asociada Señora Fiol Matta.
[La Universidad] necesita también contacto con la existencia pública, con la realidad histórica, con el pre-sente, que es siempre un integrum .... La Universidad tiene que estar abierta a la plena actualidad; más aún: tiene que estar en medio de ella, sumergida en ella.(1)
Misión de la Universidad, José Ortega y Gasset
Confiamos, además, que la nueva forma de convivencia académica propuesta, marque el desarrollo de un clima de mutua cooperación y respeto entre la administración, el personal universitario y los estu-diantes, para cuya formación y be-neficio, nuestro gobierno no ha esca-timado esfuerzos ni recursos.(2) Informe de la Comisión de Instruc-ción y Cultura de la Cámara, 1965.
La decisión de la cual disiento es histórica, primordial-mente, por la falta de concordancia entre la controversia planteada por el recurso de apelación y las expresiones del Tribunal.(3) El resultado ha sido una opinión que, en su afán de controlar el resultado del proceso que se dará a nivel de primera instancia, ha impuesto pautas a ese foro que son tanto improcedentes como ambiguas. Ese mismo objetivo ha convertido la mayor parte de la Opinión en un dictum sin precedente.
*440 Además, si bien es cierto que la Opinión mayoritaria parece reconocer en algunas oraciones el derecho a la liber-tad de expresión del estudiantado, sus palabras son nega-das por su razonamiento y conclusiones sobre la relación Estudiante-Universidad. Por eso, me temo que la conse-cuencia de esta decisión sea abrir la puerta a que se vul-neren derechos constitucionales fundamentales de los es-tudiantes de nuestro primer centro docente. Por esa razón, y porque entiendo que no debemos invadir el espacio de discreción que antes hemos reconocido al Tribunal de Pri-mera Instancia, me veo en la obligación de expresar mi opinión.
I
Al enfrascarse en desarrollar pautas para guiar la dis-creción del Tribunal de Primera Instancia, la mayoría uti-liza un lenguaje innecesariamente inclusivo que engloba a todo el estudiantado de la Universidad bajo el poder de un injunction solicitado, pero aún no concedido. Este uso de la frase vaga y totalizadora de "los estudiantes” no tiene mé-rito alguno, ya que el estudiantado en general no fue in-cluido como parte en la demanda.(4) En segundo lugar, los señalamientos de la mayoría en torno a los pormenores del contenido, entiéndase el alcance y la cualidad, del injunction son tan amplios que la procedencia de ese remedio se convierte, en cierto sentido, en una cuestión ya prejuzgada fuera del foro correspondiente.
La mayoría, citando a Madsen v. Women’s Health Center, Inc., 512 U.S. 753 (1994), resalta que el injunction, para regular las actividades y, tal vez, la expresión de un *441 grupo en particular, está justificado siempre y cuando esté basado en una disputa específica entre partes reales. íd., pág. 762. Además, se refiere al grupo que ha de afectarse por el injunction como un colectivo cuyos componentes comparten la misma visión sobre determinado asunto. íd., pág. 763. Ahora bien, en el caso ante nuestra consideración el grupo particular al que se dirigiría la demanda de injunction incluye al Presidente del Consejo General de Es-tudiantes y a varios líderes estudiantiles (los deman-dados). Simplemente, no entendemos cómo la Opinión da por sentado que el injunction aplicaría a “los estudiantes” no incluidos como parte sin considerar, entre otras, las in-terrogantes siguientes.
¿Aplicaría el injunction a todos los estudiantes de la Universidad por el mero hecho de que una orden judicial de injunction penda sobre el Presidente del Consejo General y algunos estudiantes? De ser la respuesta en la afir-mativa y presumiendo que la orden se extienda al Consejo General, ¿están todos los estudiantes, en este contexto, le-galmente identificados con éstos, o con el Consejo, al mo-mento de realizar sus actos individuales de expresión? Por otro lado, ¿aplicaría el interdicto a estudiantes que lleven a cabo otros actos de expresión por su cuenta, sin participar en los eventos celebrados por el Consejo General ni responder a su llamado? ¿Estaría prohibido cualquier acto, por decisión individual de un estudiante, cuyo fin se pueda de-finir ampliamente como “impedir” el paso a los espacios universitarios, aunque sea de forma no violenta y persua-siva?(5)
Es evidente el peligro que presenta el lenguaje inclusivo utilizado por la mayoría en el caso ante nuestra considera-ción. Este lenguaje engloba a “los estudiantes” de manera general y sin criterio alguno. De esa forma, abre la puerta *442 a que cualquier estudiante de la comunidad universitaria advenga violador del injunction, si es que éste se concede, por el sólo hecho de ejercer su derecho a manifestarse. Pro-cedo a ilustrar con más detalles dicho señalamiento.
Según la Regla 57.5 de Procedimiento Civil de 2009,(6) “[t]oda orden que conceda un entredicho provisional o un injunction preliminar o permanente ... [s]erá obligatoria solamente para las partes en la acción, sus oficiales, agen-tes, sirvientes(as), empleados(as) y abogados o abogadas y para aquellas personas que actúen de acuerdo o participen activamente con ellas y que reciban aviso de la orden me-diante cualquier forma de notificación”. (Enfasis nuestro.) De esta regla se deduce que su alcance puede extenderse, más allá de las partes en la acción judicial, a terceros que realicen el acto prohibido, sujeto a dos condiciones: que tengan un vínculo legal con los demandados de tal natura-leza que requiera la extensión de la prohibición, o que ha-yan actuado en concierto con la parte contra quien se emite el injunction.
Desafortunadamente, el alcance de este remedio ex-traordinario sobre personas ajenas al pleito es un tema poco atendido en nuestra jurisdicción. Nuestros tratadistas tampoco abundan mucho sobre ello. El doctor Cuevas Se-garra arroja algo de luz, al expresar que “[e]n estos casos, debe demostrarse que la persona no [incluida como] parte, participó en el acto o está legalmente identificado con el demandado”.(7) Además, señala que “[l]a totalidad de las circunstancias indicará si una persona no demandada en el epígrafe del interdicto, está obligada por éste”.(8)
A su vez, el tratadista Rivé Rivera explica que el lazo jurídico requerido, conocido en el “common law” como pri- *443 vity, se define como aquel que ata al tercero en solidaridad jurídica a la parte demandada.(9) Sin embargo, no elabora sobre el significado del requisito de “actuar de acuerdo” con las partes. Como alternativa, remite a una célebre senten-cia del juez Learned Hand, que sostiene que un injunction no puede ser tan amplio que equivalga a emplazar al mundo entero. Por lo tanto, “the only occasion when a person not a party may be punished, is when he has helped to bring about, not merely what the decree has forbidden, because it may have gone too far, but what it has power to forbid, an act of a party. This means that the respondent must either abet the defendant, or must be legally identified with him”. (Enfasis nuestro.(10)
Careciendo, pues, de jurisprudencia o doctrina propia sobre este tema de gran interés, me veo obligada a recurrir a la jurisprudencia federal por su evidente valor persuasivo.(11) Vale señalar que el equivalente de nuestra Regla 57.5 de Procedimiento Civil de 2009 en la jurisdic-ción federal es la Regla 65 de Procedimiento Civil federal, cuyas disposiciones en la parte que nos concierne son idénticas.(12)
En cuanto a este asunto, el Tribunal Supremo federal se *444 ha expresado en contadas ocasiones sobre el alcance del injunction sobre terceros no incluidos como parte demandada. En 1934, el máximo foro federal se expresó como sigue: “It is true that persons not technically agents or employees may be specifically enjoined from knowingly aiding a defendant in performing a prohibited act if their relation is that of associate or confederate(Enfasis nuestro. )(13) Posteriormente, el Tribunal Supremo federal aplicó la doctrina del “common-law” que reconocía que el injunction puede obligar a terceros, en la medida en que éstos se identifiquen con la parte en el pleito judicial, bajo una de estas premisas: “a decree of injunction not only binds the parties defendant but also those identified with them in interest, in ‘privity’ with them, represented by them or subject to their control.” (Enfasis nuestro.(14) En la jurisdicción federal, el término privity se define de la manera siguiente: “[t]he connection or relationship between two parties, each having a legally recognized interest in the same subject matter (such as a transaction, proceeding, or piece of property).” Además, se reconoce otra acepción al vocablo, a saber: “[m]utuality of interest.”(15)
Los tratadistas Wright, Miller y Kane tratan el asunto de privity en el contexto de las organizaciones o asociacio-nes no incorporadas. Explican que, como consecuencia del requisito de privity, a los miembros de una organización no se les puede hallar incursos en desacato por violar un injunction, sobre la base de que los oficiales de la organiza-ción fueron emplazados y están sujetos a sanciones si vio-lan la orden de injunction:
*445 Perhaps it is because members of associations or organizations are not specifically listed in the rule as a category of persons bound by a decree; yet, in most contexts they would qualify as “persons in active concert or participation” ... there may be a reluctance to bind the members of an organization unless it has effective control over and actually speaks for its membership with regard to the sphere of activity affected by the court’s order and unless it is clear that the interests of the individuals comprising the group were fully represented in the injunction proceeding. Unions appear to meet these qualifications. 11A Wright, Miller and Kane, Federal Practice and Procedure: Civil 2d Sec. 2956, pág. 356 (1995).(16)
Según el Reglamento General de Estudiantes de la Uni-versidad de Puerto Rico, Reglamento Núm. 7733 del De-partamento de Estado de 9 de septiembre de 2009, el Con-sejo General tiene facultad para representar oficialmente al estudiantado en los actos celebrados dentro y fuera del recinto, servir de foro para la discusión, convocar a asam-bleas, someter recomendaciones, realizar actividades cul-turales, académicas, educativas, y participar en la creación y enmienda de reglamentos, entre otras.(17) El Consejo General no tiene el poder de representar a todo el estudian-tado en todas las incontables actividades y todos los actos que constituyen expresión. Tampoco se contempla en nin-guna parte de la disposición antes mencionada la posibili-dad de que el Consejo General pueda controlar efectiva-mente las actividades de sus miembros. Concluir lo contrario nos llevaría a la ilógica conclusión que cada uno de los estudiantes que se expresan dentro y fuera de los predios de la Universidad está sujeto a una estricta fisca- *446 lización y control por parte del Consejo General. Esto sig-nificaría que los estudiantes, como seres humanos libres, no podrían actuar independientemente de cualquier pro-nunciamiento de su cuerpo representante ante la Administración.
Por otro lado, el Tribunal Supremo federal no se ha ex-presado concretamente sobre lo que significa “active concert” según la Regla 65(d)(2)(C) federal, o sea, el “actuar de acuerdo” de nuestra Regla 57.5. A nivel apelativo federal, en NBA Properties, Inc. v. Gold, 895 F.2d 30 (1er Cir. 1990), se requirió prueba de que se había ayudado o asistido a violar el injunction para confirmar la existencia del acto concertado. O sea, que había que: "... ‘aid and abet’ the party to violate a decree.”(18) Por ello, el haber incurrido en el acto prohibido no significa automáticamente que se ex-tienda el injunction para cubrir a un tercero no incluido como parte, aunque
Similarly, the mere fact that a person has committed the enjoined act does not necessarily mean that the injunction should be enforced against him. Generally speaking, only if a person has acted in concert with those named in the injunction or is an officer, agent, servant, employee, or attorney of a named party ... is that person in privity with those enjoined and amenable to being bound by the decree. (Énfasis nuestro.(19)
En resumidas cuentas, si un injunction aplica a terceros que no fueron incluidos como parte es un asunto que lo decidirá el Tribunal de Primera Instancia caso a caso, de acuerdo con su apreciación de los hechos particulares de cada situación. Sin embargo, al referirse repetidamente a la aplicación del injunction contra “los estudiantes”, la ma- *447 yoría parece presumir, sub silentio, que todos “los estu-diantes” actúan en acuerdo con el Consejo General. Con ello se abre la probabilidad de violaciones al derecho al debido proceso de ley de los individuos que componen el estudiantado, pues sería suficiente identificarlos como tal para aplicarles las sanciones del injunction, sin necesidad de presentar prueba de que cada uno actuó en concierto con el Consejo General, y sin darles la oportunidad de de-fenderse demostrando que sus actos fueron independientes de esa parte. Respecto a esto, el máximo foro federal ha reiterado en varias ocasiones lo siguiente: “[t]he courts, nevertheless, may not grant an enforcement order or injunction so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law” (Enfasis nuestro.(20)
En este contexto, hay que mirar más de cerca lo que dice la mayoría sobre el alcance del contenido del injunction. La Opinión recomienda que cuando el foro primario pondere el recurso, el remedio sea “estrechamente diseñado para impedir que se obstaculice la entrada y salida del campus ...”.(21) Esta directriz es extremadamente preocupante, ya que adjudica un asunto que no está en controversia en esta etapa del caso. Tristemente, es consecuente con el resto de la opinión.
Primero, la Opinión interviene indebidamente y, al ha-cerlo, menoscaba la discreción que tiene el juzgador de los hechos para determinar, no tan sólo la procedencia del re- *448 curso extraordinario, sino los elementos específicos de la orden.(22)
Segundo, la Opinión mayoritaria pretende diseñar un injunction con los fundamentos y cuestiones fácticas del pasado conflicto universitario. Así, la Opinión ignora un principio cardinal del recurso extraordinario del injunction: “[e]l injunction se concede siempre a tenor con los hechos prevalecientes a la fecha de la vista y no a aquellos existentes al momento de presentar la demanda de injunction.”(23)
Tercero, la recomendación dictada por la mayoría es-tructura el contenido de la orden de forma tan amplia que ignora la extensa gama de posibles expresiones que pueden realizar los estudiantes en son de protesta pacífica. Las vías expresivas del estudiantado de nuestra Universidad son tan diversas, múltiples y heterogéneas que no se puede, con consciencia tranquila, ordenar lo que la Opinión mayoritaria recomienda sin violar al estudiantado el dere-cho a la libertad de expresión. (24)
II
Ahora bien, el asunto más inquietante de la Opinión lo encontramos en el último trecho de la ponencia mayori- *449 taria. Éste adolece de una visión reduccionista sobre el pro-pio concepto de la Universidad, a partir de la cual simpli-fica excesivamente la controversia. La concepción de la Universidad que aporta la voz mayoritaria no responde al propósito y los fines de esa institución, pues pretende limi-tar la misión de la Universidad a una interpretación res-trictiva de la arquetípica “casa de estudios”. La visión ma-yoritaria niega la realidad de la multiplicidad de misiones, objetivos, funciones y aspiraciones de la institución. El pro-blema es que, al analizar la controversia desde su reducida perspectiva, la Opinión se embarca en disquisiciones sobre asuntos constitucionales que no fueron planteados ante el foro primario.
A. La opinión mayoritaria parte de la visión clásica de la Universidad como “casa de estudios”. Sin embargo, la verdadera “casa de estudios” no almacena las ideas en ana-queles ni reconoce solamente las que están en su catálogo. Por eso, aunque coincido en que la misión primordial de la Universidad es ser una “casa de estudios”, me asombra que sirva esto de justificación para el tono autoritario y repre-sivo con el que la Opinión analiza los derechos del estu-diantado y las prerrogativas de la Administración.
De inicio, no coincidimos con las expresiones de la ma-yoría sobre el efecto negativo de las manifestaciones estudiantiles. Para la mayoría, las protestas universitarias crean polémicas entre los estamentos de nuestro primer centro docente y generan gran tensión en Puerto Rico. Este análisis evade la posibilidad de que las manifestaciones, en vez de causar desasosiego, sean resultado del descontento social producido.(25) Más importante aún, ignora la natura- *450 leza de la Universidad como centro de intercambio de ideas que, por su propia función, fomenta relaciones dinámicas entre sus miembros que muchas veces trascienden lo verbal e incluso el plano físico de nuestro primer centro docente. Ello es testamento a la Universidad como “centro de ebullición, de irradiación de valores y de circulación de reclamos cruciales en nuestra vida de pueblo”.(26) Por lo tanto, decir que los actos de expresión estudiantil desenca-denan sui géneris el malestar general en nuestro Pueblo es irresponsable y desacertado.
Tampoco es correcta la restrictiva visión educativa que somete al estudiantado a una posición de pasividad. Por el contrario, conforme surge del Informe del Comité de Edu-cadores ante la Cámara de Representantes: “[d]entro de los conceptos de una educación dinámica que respeta el desa-rrollo de la personalidad humana, no podemos situar al estudiante como un ente pasivo, cuya vida académica ha de limitarse a recibir y transmitir una herencia cultural. Toda la vida universitaria educa. Las oportunidades de partici-pación estudiantil que deseamos garantizar no son meras concesiones de unos adultos a unos jóvenes, sino más bien un esfuerzo honesto para aprovechar el valor educativo de toda gestión universitaria.” (Enfasis nuestro.)(27)
El Artículo 2 de la Ley Núm. 1 de 20 de enero de 1966, conocida como la Ley de la Universidad de Puerto Rico,(28) establece los diversos objetivos de la Universidad y resume su misión en el binomio de producir cultura y servicio al Pueblo de Puerto Rico.(29) Esta misión principal de nuestro primer centro docente se sostiene en la perpetuación y transmisión del conocimiento por parte del claustro y en la *451 responsabilidad de los egresados de difundir ese conoci-miento en la práctica, para el beneficio colectivo de nuestra sociedad. A eso se refiere el historial legislativo cuando re-conoce que “[s]iendo la Universidad máxima casa de estudios [,] sus objetivos y funciones deben ser aplicados por entero al estudiante. El concepto de la ‘formación’ del estu-diante que establece el proyecto precisa, por lo tanto, la aplicación de dos criterios: deberá ser íntegra y orientada al servicio”. (Enfasis nuestro.(30)
A su vez, el Artículo 7 de la Ley de la Universidad dis-pone que los estudiantes serán colaboradores en la misión de cultura y servicio de la Universidad y, como miembros de la comunidad universitaria, gozarán del "derecho a par-ticipar efectivamente en la vida de esa comunidad y ten-drán todos los deberes de responsabilidad moral e intelec-tual a que ella por su naturaleza obliga”. (Enfasis nuestro.(31) Ciertamente, los objetivos de la Ley de la Uni-versidad de Puerto Rico no pueden interpretarse de forma tan restrictiva que menoscaben las demás misiones de la Universidad. Al repasar las citadas disposiciones, debemos recordar que la norma de hermenéutica de analizar los mo-tivos y finalidades de la norma jurídica conlleva “una deli-cada y compleja apreciación de intereses prácticos y de ideales éticos y culturales, [que s]obre todo exige ahondar en las realidades de la vida, en sus exigencias económicas y sociales”.(32)
La discusión y el diálogo entre los diversos componentes de la comunidad universitaria constituyen otro espacio *452 dentro de la Universidad donde se puede cumplir con el binomio servicio-cultura. Es, en efecto, más allá del aula, en los espacios de participación estudiantil donde se con-cretan estas oportunidades educativas que propenden al desarrollo de las diferentes dimensiones de la personalidad moral, donde se foijan los estudiantes con la calidad y res-ponsabilidad moral que requiere nuestra Universidad. Es-tudiosos de la realidad universitaria han reconocido que es esta responsabilidad moral la que ha llevado a que, “con su activismo, los estudiantes hayan dado en más de una oca-sión la voz de alerta que se corrija el rumbo en asuntos medulares de nuestra comunidad”.(33) Así, en el contexto de un intercambio activo y una educación dinámica, se for-man autónoma y racionalmente dentro de la “casa de estu-dios” las mujeres y los hombres líderes del mañana.
En resumidas cuentas, por su trayecto centenario, la Universidad es nuestro proyecto público por excelencia. Es nuestra más preciada inversión para el futuro, no sola-mente para propiciarle al estudiantado títulos y oportuni-dades de movilidad social, sino para formar mujeres y hombres de bien, de consciencia. Por eso no es posible con-cebir a la Universidad como un centro de aprendizaje, li-mitado a ser, prácticamente, una casa de cuido. Se des-prende de lo anterior que una apreciación correcta de una “casa de estudios” centrada en educar y rendir servicio a nuestro pueblo, debe, y puede, coexistir con el ejercicio de la responsabilidad moral de los estudiantes de expresar sus preocupaciones e inquietudes y manifestar su repudio a lo que les parezca objetable, claro está, de manera pací-fica, lo cual no quita que sea a veces vociferante. Sólo en esta coexistencia entre el salón de clases y el salón de la vida puede sobrevivir la Universidad como integrum de *453 nuestra sociedad democrática, y así rendirle un verdadero servicio a Puerto Rico.
B. La opinión mayoritaria le dedica una porción signi-ficativa de su ponencia a esclarecer la “controversia” sobre la definición y los límites de la huelga estudiantil. Estas expresiones son un claro y patente dictum en toda regla, pues no hay tal controversia ante la consideración de este Tribunal y su discusión poco abona a resolver la alegada academicidad de la demanda de injunction.
Como sabemos, la Administración presentó una de-manda jurada el 21 de abril de 2010, en la cual solicitó al foro de instancia que emitiera un entredicho provisional, un interdicto preliminar y permanente y un interdicto posesorio. Además, incluyó otras causas de acción al am-paro de la ley sobre estorbo público(34) y en daños y perjui-cios contra la parte demandada. Al instar la demanda, la Administración no formuló alegación alguna acerca del de-recho de los estudiantes a irse a la huelga. Posteriormente, el Tribunal de Primera Instancia emitió un entredicho provisional el 22 de abril de 2010 y un interdicto preliminar el 30 de abril de 2010, en los cuales nada expresó sobre este asunto. Más aún, con el fin de incluir a otros estudiantes como codemandados, la Administración presentó una De-manda Enmendada Jurada el 19 de mayo de 2010 y tam-poco alegó al respecto. Una vez terminado el conflicto estu-diantil, mediante el mecanismo de mediación, el foro primario emitió una Sentencia Parcial y Orden el 29 de junio de 2010, en la cual se limitó a declarar que la contro-versia era académica y ordenó que la acción en daños y peijuicios presentada por la Administración, junto a la Re-convención y Demanda contra Tercero presentada por los codemandados, siguiera el trámite ordinario. Nada se dijo sobre la situación de la “huelga”. Luego, en su recurso de *454 apelación presentado ante el Tribunal de Apelaciones, la Administración hizo tan sólo dos señalamientos de error, ambos relacionados con la academicidad de la contro-versia(35) Nuevamente, no alegó controversia alguna sobre la naturaleza de la “huelga”.
A la luz de lo antes dicho, las expresiones en torno a la huelga estudiantil son, como mínimo, improcedentes e in-transcendentales para efectos de descargar nuestro deber ministerial de revisar el dictamen emitido por el foro primario. Este Tribunal ha recalcado en varias ocasiones que las expresiones innecesarias acerca de interrogantes jurídicas que no le han sido planteadas propiamente no *455 sientan precedente jurídico alguno.(36) Es decir, los pronun-ciamientos sobre asuntos que no están en controversia “simplemente se debe[n] tener por no puesto [s], ya que no constituye [n] parte necesaria del fallo, sino que muchas veces son meras expresiones judiciales excesivas e innecesarias”. Ortiz v. Panel F.E.I., 155 D.P.R. 219, 252-253 (2001). Ahora bien, aún constituyendo dictum, las ex-presiones de la mayoría sobre la “huelga estudiantil” no dejan de ser altamente preocupantes. Por lo tanto, procede esclarecer ciertas cuestiones sobre este asunto.
El mencionado dictum, además de ignorar el movi-miento social de la comunidad universitaria y despresti-giar la expresión estudiantil, reduce el vínculo entre la Universidad y su estudiantado a una mera relación contractual entre partes privadas. Esta percepción es contra-ria a la misión que históricamente ha representado la pro-pia institución. Dicho análisis se fundamenta en una comparación literal entre estudiantes y obreros en el con-texto de la “huelga”. En sus partes pertinentes, la mayoría expresa que “[la] relación [de los estudiantes] con la uni-versidad es de naturaleza contractual”, y que “[c]ada estu-diante firma un acuerdo con la U.P.R. en la que la segunda [parte] se compromete a enseñar y el primero a cumplir con sus deberes académicos”.(37) Acto seguido, la mayoría remite a los artículos pertinentes del Código Civil de Puerto Rico que regulan los contratos.(38)
Esta reducción de la relación Estudiante-Universidad a una estricta relación contractual no encuentra base alguna en nuestro ordenamiento jurídico. Para fundamentarla, la Opinión recurre a dos casos: Ross v. Creighton University, *456 957 F.2d 410 (7mo Cir. 1992), y Zumbrun v. University, 101 Cal Rptr. 499 (Cal. Ct. App. 1972). El primero se da en el contexto de la universidad privada. Además, los hechos de ese caso son enteramente distintos a los de la controversia que resuelve el Tribunal. En Ross, el demandante instó una acción en daños y perjuicios contra la universidad por-que ésta, a su entender, actuó de forma negligente al no proveerle ciertos servicios educativos prometidos por la administración.(39) El caso Zumbrun, por su parte, resuelve también que la relación básica entre un estudiante y una universidad privada es de naturaleza contractual. Id., pág. 504.
Aunque hay varios casos estatales que conciben la rela-ción Estudiante-Universidad Pública como contractual, la Opinión no se refiere a ellos, quizás porque también con-cluyen que, en ese contexto de una institución pública, las controversias no se pueden resolver aplicando estricta-mente el Derecho contractual. Así concluyó el mismo tribunal apelativo que resolvió el caso citado por la mayoría, el del estado de California, en un caso mucho más reciente, Kashmiri v. Regents of University of California, 156 Cal.App.4th 809, 825 (2007). El tribunal resolvió en este caso que la relación Estudiante-Universidad no debe enca-jonarse en una categoría doctrinal: “Although courts have characterized the relationship between the student and educational institution as contractual, they have recognized that contract law should not be strictly applied. The student-university relationship is unique, and it should not be and cannot be stuffed into one doctrinal category.” (En-fasis nuestro.) íd., pág. 825.(40)
La Opinión del Tribunal recurre también a una compa- *457 ración que nada tiene que ver con la controversia de este caso, entre los estudiantes y los obreros, para concluir que los estudiantes no tienen derecho a “negociar colectiva-mente”. (41) Aparte de que resulta evidente que los estu-diantes no son obreros ni están cobijados por las garantías laborales pertinentes a éstos, ésta nos parece una discu-sión sin razón de ser, pues lo importante no es si los estu-diantes tienen derecho a la huelga cual obreros, sino si tienen derecho a expresarse, reunirse y manifestarse cual ciudadanos de este país.(42)
Las aseveraciones de la mayoría, en torno a la negocia-ción colectiva, chocan con el propio Reglamento General de Estudiantes que faculta al Consejo General a “[p]roponer al Senado Académico, Rectory otros foros universitarios, la formulación de normas y políticas institucionales sobre cualquier asunto que estimen pertinente y recibir su res-puesta oficial”. (Enfasis nuestro.)(43) Aunque esta disposi-ción no constituye el equivalente de “negociar colectiva-mente”, sí establece, como mínimo, un requisito de diálogo productivo entre la Administración y los diversos miem-bros de la comunidad universitaria. (44) Las expresiones de la mayoría constituyen una negación tácita del derecho al diálogo de los estudiantes con la Administración, para el beneficio de ambas partes.
*458 Como ya expresamos, los razonamientos que fundamen-tan el análisis de la mayoría rayan en el reduccionismo jurídico. Se trata de una tendencia hacia la simplificación de las controversias que, según explica la profesora Fontá-nez Torres, elimina de toda consideración los aspectos que no puedan reducirse al dualismo legal/ilegal, “opacando los asuntos subyacentes y convirtiendo el conflicto en uno de mera racionalidad legal”.(45) Esto, precisamente, es lo que hace la Opinión mayoritaria al centrar una porción no des-preciable de su ponencia en la discusión de la controversia sobre la legalidad/ilegalidad de los actos estudiantiles de cerrar la Universidad, lo cual, como ya mencionamos, es puro dictum.
Pero no por ello deja de tener efectos negativos y perniciosos. El enfoque mayoritario construye una realidad universitaria superficial, que reduce todo a que los estu-diantes no tienen un derecho a la huelga, como los obreros, y a que sus funciones como estudiantes están delimitadas en derecho por un marco contractual. Con este proceder, se pretende privilegiar el orden público a costa de los dere-chos de libertad de expresión del estudiantado de nuestro primer centro docente. Sin embargo, el orden público “no se comprende ... no puede existir ni mantenerse si no se rinde constante tributo de respeto a la libertad individual, al derecho y la dignidad del hombre, porque si la opinión pública no puede manifestarse, el orden público es una quimera”.(46)
*459 Voto particular emitido por la Juez Asociada Señora Rodrí-guez Rodríguez.
La Justicia debe proteger la pro-testa y no acallarla.

Roberto Gargarella

Las expresiones de la Jueza Asociada Señora Fiol Matta así como las del Juez Asociado Señor Rivera García sobre la controversia que ha generado el caso de epígrafe, me obligan a reflexionar sobre la naturaleza del sistema de democracia constitucional que pregonamos se vive en nuestro país y su interrelación con nuestra función como jueces. No hay duda que la forma en que el “nuevo” Tribunal piensa los valores democráticos que encarna nuestra Constitución es muy diferente a lo que considero necesario e imprescindible para que nuestra democracia siga su curso de crecimiento y enriquecimiento.
Al igual que el Prof. Cass Sunstein, considero que una de las más grandes contribuciones del sistema de gobierno establecido en la Constitución de Estados Unidos es que garantiza la diversidad de opinión, el choque de ideas y la divergencia; valores que sin duda recoge la nuestra. El pro-fesor Sunstein señala:
The framer’s greatest innovation consisted ... in their skepticism about homogeneity, their enthusiasm for disagreement and diversity, and their effort to accommodate and to structure that diversity. ... As the framers stressed, widespread error is likely to result when likeminded people, insulated from others, deliberate on their own. In their view, heterogeneity of opinion can be a creative force. A Constitution that ensures the “jarring of parties” and “differences of opinion” will provide safeguards against unjustified extremism and unsupportable movements of view. C.R. Sunstein, Why Societies Need Dissent, Massachusetts, Harvard University Press, 2003, págs. 150-151.
*460 Los orígenes de este ideal se remontan a la antigua Grecia. Aristóteles sugería que cuando grupos divergentes o disímiles “all come together ... they may surpass —collectively and as a body, although not individually— the quality of the few best... When there are many who contribute to the process of deliberation, each can bring his share of goodness and moral prudence; ... some appreciate one part, some another, and all together appreciate all”. Aristotle, Politics, 123 (E. Baker, trans. 1972), según citado por C.R. Sunstein, The Law of Group Polarization, Chicago Working Papers in Law and Economics (Second Series), December 1999.
El derecho a la libre expresión sirve para garantizar en nuestro entorno espacios para la disidencia y la diversidad. Es evidente que el derecho a la libertad de expresión es algo más que la protección debida al ciudadano para que éste se exprese, pues su importancia trasciende al interlocutor. “[E]xisten razones vinculadas al proyecto co-lectivo democrático”, sobre las cuales se asienta este derecho. É. Fontánez Torres, Notas para el ejercicio de la protesta (Parte 2): Fiss, Primera enmienda, piquetes y pro-testa, http://poderyambiente.blogspot.com. La profesora Fontánez Torres nos explica la postura del profesor Fiss sobre este asunto, citándole:
Esta teoría, [la que centra la libertad de expresión en el orador o el individuo que se expresa], sin embargo, no explica acaba-damente el especial compromiso que tiene la Constitución con la protección de la libertad de expresión. Se requiere una ra-zón más importante para proteger la expresión y, en la bús-queda de tal razón, la teoría de la Primera Enmienda domi-nante vincula el derecho a la libertad de expresión con el interés de la sociedad en la democracia. O. Fiss, Democracia y disenso: una teoría de la libertad de expresión, Buenos Aires, AD-Hoc, 2010, pág. 76, citado en Fontánez Torres, supra.
Este derecho es entonces un valor fundamental para la supervivencia de la democracia. Como jueces, nuestra fun-ción debe ser garantizarlo, no emascularlo.
*461 La democracia, a fin de cuentas, se asienta sobre el disenso. El derecho a protestar es lo que se ha llamado una de las caras de la libertad política en un sistema democrático.(1) Si consideramos que el verdadero poder o la verdadera autoridad reside en el pueblo, y que el gobierno es sólo un mandatario de éste, la crítica se torna, necesa-riamente, en uno de los fundamentos de toda democracia constitucional. Dicho de otra forma, si hemos delegado en el gobierno la toma de decisiones de aquello que nos afecta, “lo mínimo que podemos hacer es preservarnos el derecho de criticar a aquellos en los que hemos delegado todo”. E. Rodríguez, No hay democracia sin protesta; las razones de la queja, entrevista a Roberto Gargarella, www.ciaj.com /ar (última visita 29 de diciembre de 2010). Así entendido, lo-gramos apreciar que el derecho a protestar, a disentir, a expresar nuestra disconformidad es un derecho que ejerce-mos por la sola razón de vivir en una sociedad democrática. Es por ello que estamos obligados a resguardarlo con especial rigor, porque lo que hacemos es, en realidad, proteger la democracia misma. Véase Soto Martínez, supra, pág. 7.
No debemos temerle al debate público robusto. Este en-riquece nuestra vida colectiva y es eje central para que el ciudadano pueda seguir actuando como tal y de esta forma garantizar los valores democráticos que se recogen en nuestra Constitución. El profesor Gargarella, consciente de los inconvenientes que causan las protestas, concluye “que la protesta no es un derecho más. El derecho a criticar a las autoridades es reconocido como un ‘superderecho’, lo que yo llamo el primer derecho. Si se apaga la crítica al poder, la propia democracia resulta socavada, pierde sentido”. Rodríguez, supra.
Hanna Arendt postulaba que, en el pensamiento griego, *462 acción y discurso eran dos facultades que iban de la mano y eran las más elevadas de todas. La idea del “animal po-lítico”, estaría asociada en Aristóteles a la idea de defini-ción del hombre como “ser vivo y capaz de discurso”. El esclavo, por otra parte, sería aquel que está fuera del es-pacio donde se conjugan la acción y el discurso, no porque no tenga la facultad de hablar, sino porque el diálogo no constituye para él —como ocurre con los hombres libres— una preocupación primaria. H. Arendt, La Condición Humana, Buenos Aires, Ed. Paidós, 1993, págs. 39-41. Véase, también, Soto Martínez, supra, págs. 12-13 y esc. 23. Por lo tanto, es ese debate robusto lo que hace de mujeres y hombres seres verdaderamente libres. Es lo que nos per-mite romper las cadenas de la esclavitud y del servilismo.
Por otro lado, nuestro sistema democrático se debe pre-ocupar por proteger no tan sólo a las mayorías, sino tam-bién a las minorías. “El sistema institucional, con los tre-mendos defectos que tiene, se diseñó para defender al mismo tiempo al gobierno y a la oposición. Una parte protege a la mayoría (a través de ramas políticas, que depen-den del voto), y otra para que el crítico no quede desguar-necido (a través de la Justicia, que no depende del voto.) Esto no quiere decir que la Justicia avale cualquier tipo de crítica. Pero si en vez de proteger a los críticos hasta último momento, los jueces buscan acallarlos, como suele ocurrir aquí, renuncian a su misión principal.” (Enfasis nuestro.) R. Gargarella, La justicia debe proteger la protesta y no acallarla, www.paginal2.com.ar/diario/elpais/1-55110-2005-08-15.html (última visita 28 de diciembre de 2010). Son los jueces quienes, por estar ajenos al vaivén electoral, pueden ser escudo que protege y lanza que defiende los derechos de la minoría y del disidente.
Este Tribunal no puede fungir como un mandatario de la mayoría electoral. Sunstein, op. cit., pág. 190 (“The Supreme Court, unlike elected officials, is not supposed to represent the electoral majority”). Nuestra misión es reco-nocer la importancia que para la vida misma en democra- *463 cia tiene proteger el derecho a la expresión, la disidencia y a la protesta pacífica, así como protección de las minorías frente a los excesos de la mayoría. Porque en esto creo, me resulta por demás decepcionante y trágico observar el re-troceso que ha supuesto el “nuevo” Tribunal.
Voto particular emitido por el Juez Asociado Señor Rivera García, al que se unen el Juez Asociado Señor Martínez Torres, la Jueza Asociada Señora Pabón Charneco y el Juez Asociado Señor Kolthoff Caraballo.
I, of course, do not mean to say or even to intimate that freedom of speech, press, assembly, or petition can be abridged so long as the First Amendment remains unchanged in our Constitution. But to say that the First Amendment grants those broad rights free from any exercise of governmental power ... would subject all the people of the Nation to the uncontrollable whim and arrogance of speakers, and writers, and protestors, and grievance bearers.
Were the authority of government so trifling as to permit anyone with a complaint to have the vast power to do anything he pleased, wherever he pleased, and whenever he pleased, our customs and our habits of conduct, social, political, economic, ethical, and religious, would all be wiped out, and become no more than relics of a gone but not forgotten past.(1)

Justice Hugo Black

United States Supreme Court

*464 I
Nuestra Ley Suprema proclama con palmaria claridad que “el sistema democrático es fundamental para la vida de la comunidad puertorriqueña”. (Enfasis nuestro.) Preám-bulo, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 266. Como derivación lógica de tal sistema democrático, resulta forzosa la existencia de una Constitución. Véase C.J. Friedrich, La democracia como forma política y como forma de vida, (S. Martínez Haba y G. Wasserziehr de Martínez, trads.) 2da ed., Madrid, Ed. Tecnos, 1966, pág. 14. En ella, todo funcionario público —incluyendo el juez— encuentra su fuente de poder —al igual que los límites a éste— y se garantizan las libertades fundamentales del ciudadano, incluso las indemnidades de aquellos que se encuentran en la minoría. Id.
Es a la luz de esta realidad social que esta Curia ha articulado que
[s]e incluyen en la constitución de un país aquellos princi-pios jurídicos a los cuales desea imprimírseles estabilidad. Se trata de aquellas normas sociales que se consideran vitales para la convivencia pacífica, el bien común y la continuidad de una democracia saludable. En suma, son reglas de carácter tan esencial para una sociedad, que su permanencia no se abandona a los vaivenes de gobierno o a meros cambios de idiosincrasia. (Enfasis nuestro.) Colón Cortés v. Pesquera, 150 D.P.R. 724, 766 (2000).
Sin lugar a dudas, la garantía cardinal de la libertad de expresión consagrada en nuestra Carta de Derechos inte-gra esa lista de principios jurídicos a los cuales los padres de nuestra Constitución quisieron imprimirles estabilidad por considerarlos de importancia vital para nuestra vida democrática. Véase Art. II, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 285. No obstante, aunque el derecho a la libertad de palabra goza de primacía entre las garan-tías esenciales de nuestro ordenamiento constitucional (Asoc. de Maestros v. Srio. de Educación, 156 D.P.R. 754, *465 767 (2002)), su alcance y ámbito de aplicabilidad nunca ha sido irrestricto o absoluto (.Ashcroft v. American Civil Liberties Union, 535 U.S. 564, 573 (2002)).
Como bien ha señalado el Tribunal Supremo federal, para que todo ciudadano de nuestra sociedad democrática goce de la libertad trascendental de poder asociarse y ma-nifestar su pensamiento y mensaje, es imperativo que tal garantía primordial encuentre su desarrollo dentro de los contornos filosóficos de una sociedad de ley y orden. Así lo concibió el más alto foro federal al articular lo siguiente:
The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. (Enfasis nuestro.) Cox v. Louisiana, 379 U.S. 536, 554 (1965).
La opinión disidente de mi estimada y distinguida com-pañera Fiol Matta parece obviar tal notoria realidad. Es por ello que a continuación expreso mis preocupaciones fundamentales relativas a las implicaciones prácticas que su ponencia podría tener sobre nuestra sociedad democrá-tica de ley y orden. Concretamente, examinaré dos elemen-tos básicos de su opinión, a saber: (1) la utilización de un discurso que no le reconoce frontera o límite alguno al de-recho a la libertad de expresión de los estudiantes, el cual tácitamente legitima los actos violentos de un grupo mino-ritario de estudiantes universitarios so pretexto de éstos ejercer una manifestación que materialice “el descontento social” que experimentan por motivo de “ las tensiones provenientes del contexto económico-social del país’ ”,(2) y (2) la confusión de la misión principal de la Universidad —ser una casa de estudio— con una de las muchas misio-nes accesorias de ésta —proveer espacios de participación *466 estudiantil que propendan al desarrollo de la personalidad moral del estudiantado— justificando así que, en aras de alcanzar las misiones accesorias de la Universidad, se per-judique la obtención del objetivo principal de ésta. Veamos.
II
A. Un reconocimiento irrestricto del derecho a la libertad de expresión que avala tácitamente la violencia de un grupo reducido de estudiantes y destruye los derechos de aquellos que desean estudiar
La ponencia disidente articula que, “si bien es cierto que la Opinión mayoritaria parece reconocer en algunas oracio-nes el derecho a la libertad de expresión del estudiantado, sus palabras son negadas por su razonamiento y conclusio-nes ... [abriendo] la puerta a que se vulneren derechos cons-titucionales fundamentales de los estudiantes de nuestro primer centro docente”. Opinión disidente de la Jueza Aso-ciada Señora Fiol Matta, pág. 440. Entre algunos de los fun-damentos que utiliza para sostener su conclusión, la compa-ñera Jueza Asociada expresa lo siguiente:
... no coincidimos con las expresiones de la mayoría sobre el efecto negativo de las manifestaciones estudiantiles. Para la mayoría, las protestas universitarias crean polémicas entre los estamentos de nuestro primer centro docente y generan gran tensión en Puerto Rico. Este análisis evade la posibilidad de que las manifestaciones, en vez de causar desosiego, sean resultado del descontento social producido. Más importante aún, ignora la naturaleza de la Universidad como centro de intercambio de ideas que, por su propia función, fomenta rela-ciones dinámicas entre sus miembros que muchas veces tras-cienden lo verbal e incluso el plano físico de nuestro primer centro docente. Ello es testamento a la Universidad como “cen-tro de ebullición, de irradiación de valores y de circulación de reclamos cruciales en nuestra vida de pueblo”. Por lo tanto, decir que los actos de expresión estudiantil desencadenan sui géneris el malestar general en nuestro Pueblo es irresponsa- *467 ble y desacertado.(3) (Énfasis y escolios omitidos.) íd., págs. 449-450.
Las antedichas declaraciones representan una peligrosa proposición por varias razones que abordamos a continuación. Primero, la opinión disidente —mediante un discurso que no le reconoce límites a la garantía constitu-cional a la libertad de expresión— coarta y atropella los derechos de los estudiantes no-manifestantes de poder re-cibir una educación de excelencia, prefiriendo que la toma —violenta o no— de un recinto por un grupo minoritario de estudiantes impida que la Universidad de Puerto Rico cumpla su cometido pedagógico por espacio de 62 días consecutivos. Al concebir que los estudiantes —sean aque-llos emplazados en el caso que nos ocupa u otros— pueden “ ‘impedir’ el paso a los espacios universitarios, aunque sea de forma no violenta y persuasiva” (modalidad de “cierre de portones” que se nos hace difícil concebir), la ponencia disidente avala tácitamente, como medio de expresión, ac-tos que van en detrimento de los derechos de otros estudiantes. Opinión disidente de la Jueza Asociada Se-ñora Fiol Matta, pág. 441.
A la mente racional le es fácil deducir que el acto de imposibilitar el acceso a un recinto universitario, sea de forma “pacífica” o no, siempre representará un acto de violencia. Por tal motivo, resulta contradictorio que la po-nencia disidente haga la salvedad que se limita sólo a ex- *468 presiones y manifestaciones pacíficas, sin endosar “los ac-tos violentos que puedan llevar a cabo ciertos individuos, estudiantes u otros”, cuando el negarle a los estudiantes no-manifestantes la entrada a la Universidad se justifique por un reconocimiento irrestricto del derecho a la libre ex-presión de ciertos estudiantes. Opinión disidente de la Jueza Asociada Señora Fiol Matta, pág. 441 esc. 5.
Segundo, la opinión disidente justifica el coartar los de-rechos de los estudiantes que desean estudiar aseverando que las manifestaciones estudiantiles de una minoría (con-sistentes en impedir el acceso a la Universidad y tomar control de ésta) nacen del “descontento social” que éstos experimentan, al igual que la concepción que ostentan en torno a la Universidad como un centro “que faculta el in-tercambio de ideas y que fomenta relaciones dinámicas en-tre sus miembros”. Sin embargo, creemos que el alegado descontento social que pueda experimentar determinado grupo de nuestra comunidad no puede ser excusa para el uso irracional de la fuerza o la violencia; o incluso, el uso de manifestaciones que vayan en detrimento de los dere-chos de los demás. En una sociedad democrática de ley y orden existen diversos medios apropiados para ventilar las frustraciones que un estudiante puede sentir ante el con-texto socioeconómico que afrenta. Así lo reconoce la opinión mayoritaria al disponer que
... los estudiantes deben poder valerse de múltiples vías alter-nas de comunicación, a saber: manifestaciones, marchas, pan-cartas, expresiones simbólicas y el uso de la tecnología, entre otros medios legítimos, siempre y cuando sus actos no inte-rrumpan el flujo normal de las clases ni atenten contra los derechos de otros individuos dentro de la comunidad universitaria. (Enfasis suplido.) U.P.R. v. Laborde Torres y otros I, 180 D.P.R. 253, 304 (2010).
Lo anterior reconoce expresamente un derecho de los estudiantes a manifestarse en el campus universitario —según lo exige el derecho constitucional a la libertad de expresión— pero limita tal derecho a que se garantice el *469 flujo normal de las clases y se protejan los derechos de otros miembros de la comunidad universitaria.
Igualmente, recurrir al cierre de una Universidad fun-damentándose en que así se atiende el descontento social que, desde la perspectiva de un sector estudiantil, les ha tocado vivir, resulta contradictorio, falto de un juicio se-reno, sensato y desprovisto de una conciencia clara del daño que dichas actuaciones le infligen al primer centro docente de nuestro país. Más aún, distinto al criterio que ostenta la opinión disidente, no concibo el pensamiento de que una Universidad cerrada faculta “el intercambio de ideas [entre la comunidad universitaria] y [fomenta] rela-ciones dinámicas entre sus miembros”. Me pregunto, ¿dón-de se hará este intercambio o flujo de ideas? ¿Cuál será el ‘punto medio’ que saciará las inquietudes estudiantiles? ¿Acaso tal ‘punto medio’ se define por la condescendencia total de la administración universitaria a todo reclamo es-tudiantil? ¿Acaso el cierre de portones y la toma de la Uni-versidad por la fuerza propicia “la discusión y el diálogo” de forma más eficiente? Claramente, la respuesta a estas in-terrogantes es en la negativa. Aún así, la opinión disidente parece sugerir lo contrario.
Considero que una Universidad cerrada, bajo el pre-texto de constituir una manifestación del derecho constitu-cional de los estudiantes a la libertad de expresión, simple-mente no puede tolerarse. Ello representa una carga demasiado onerosa para nuestro pueblo y su sistema democrático.
Tercero, la ponencia disidente de nuestra compañera Jueza Asociada omite ejercer un balance de intereses justo entre los derechos de libertad de expresión de los estudian-tes y el interés de la administración universitaria por ins-taurar un ambiente académico que cumpla con el fin edu-cativo de la institución universitaria de forma ordenada y disciplinada, a la vez que se protejan los derechos a estu-diar de los estudiantes que así deseen hacerlo.
*470 En materia de libertad de palabra, el balance de los intereses en pugna es de naturaleza crucial. Dodd v. Rambis, 535 F.Supp. 23, 27 (D. Ind. 1981) (“Freedom of expression demands breathing room. However, there are limits-no freedom is absolute. To allow such would violate the rights of others. In most instances it is the duty of the court to view the balance of interest-freedom, of expression vs. individual rights-and to weigh the detrimental effect on each”). (Énfasis nuestro.) Al analizar la pugna de intereses en el contexto universitario, esta Curia ha detallado con precisión el ejercicio de balance de intereses que los jueces estamos llamados a efectuar entre las prerrogativas cons-titucionales de los estudiantes y la encomienda de la admi-nistración universitaria de asegurar un ambiente ade-cuado de enseñanza. Así, en Sánchez Carambot v. Dir. Col. Univ. Humacao, 113 D.P.R. 153, 162 (1982), declaramos que
... es afín con la esencia vital de la universidad la norma cons-titucional que reconocimos en Rodríguez v. Srio. de Instrucción, [109 D.P.R. 251 (1979)], a los efectos de que estudiantes y profesores conservan sus derechos de expresión y asociación pacífica en consonancia con los propósitos de la institución, cuando entran a los centros de enseñanza. (Enfasis nuestro.)
A la luz de estas declaraciones, la opinión mayoritaria ejerció un balance de intereses concienzudo. Como resul-tado, reconoció que “el derecho a la libertad de expresión de estudiantes, empleados y profesores debe ser cónsono con la misión educativa de la universidad”, advirtiéndole a la administración universitaria que no tenía “un poder irrestricto para limitar el derecho a la libertad de palabra so pretexto de alcanzar sus objetivos pedagógicos”. U.P.R. v. Laborde Torres y otros I, supra, pág. 297. Igualmente, le requirió a la administración universitaria que mostrara “ ‘los hechos que razonablemente [la] han llevado a con-cluir que de permitir [determinada] actividad proscrita, se alterarían substancialmente o se causaría una seria inter- *471 vención con las actividades docentes’ (Citas omitidas). Id. Sólo así podemos alcanzar un balance adecuado entre los intereses en pugna, logrando un resultado ecuánime y justo para todas las partes involucradas en el pleito.
No obstante, al examinar la opinión disidente de mi compañera, la Jueza Asociada Señora Fiol Matta, no en-cuentro mención alguna de los intereses de los estudiantes no-manifestantes y su derecho a estudiar conforme a su voluntad. Igualmente, no se menciona la necesidad de re-conocer a la administración universitaria una deferencia adecuada al momento de procurar —mediante sus prácti-cas y políticas— el orden y la civilidad en el recinto univer-sitario, al igual que la integridad institucional del primer centro docente del país. Por último, se omite expresión al-guna sobre el derecho del pueblo puertorriqueño a tener acceso al cúmulo de recursos que provee la Universidad de Puerto Rico para el disfrute de todos. La ponencia disi-dente inclina la balanza de manera irrestricta a favor del derecho a la libertad de expresión de los estudiantes y ol-vida que en nuestro ordenamiento legal tal derecho co-existe con otros intereses de igual importancia jurídica. Por ello, un ejercicio jurídico como el empleado en la opi-nión disidente merece nuestro rechazo.
B. El sacrificio de la misión principal en aras de vindicar las misiones accesorias
Finalmente, la opinión disidente argumenta que la opi-nión mayoritaria adolece de una “visión reduccionista so-bre el propio concepto de la Universidad”, ya que concibe a ésta como una mera “casa de estudios” y “niega la realidad de la multiplicidad de misiones, objetivos, funciones y as-piraciones de la institución”. Opinión disidente de la Jueza Asociada Señora Fiol Matta, pág. 449. Citando porciones de la ley universitaria, la ponencia minoritaria reconoce que la misión de la Universidad ampara —además de su finalidad como centro de enseñanza— la producción de cul- *472 tura y servicio al pueblo puertorriqueño. íd., pág. 450. Ade-más, la compañera Jueza Asociada Señora Fiol Matta arti-cula que “ ‘no podemos situar al estudiante como un ente pasivo, cuya vida académica ha de limitarse a recibir y transmitir una herencia cultural’ ” (énfasis suprimido), sino que, “en el contexto de un intercambio activo y una educación dinámica, [éste] se forma autónoma y racional-mente dentro de la ‘casa de estudios’ [como] las mujeres y los hombres líderes del mañana”. Id., págs. 450 y 452.
También creemos que la Universidad de Puerto Rico fue diseñada con propósitos adicionales a la mera impartición de conocimiento en sus aulas de clase. Igualmente, es im-perativo que el estudiante aproveche al máximo las vastas posibilidades que nuestro primer centro docente le brinda para desarrollar su intelecto, juicio crítico, expresividad, servicio al pueblo puertorriqueño y “las diferentes dimen-siones de su personalidad moral”.
Ahora bien, la misión primordial y esencial de nuestra Universidad lo representa la enseñanza y la impartición ávida de toda faceta del conocimiento. Una vez se garan-tiza esta misión primaria mediante un ambiente ordenado y pacífico, se faculta la posibilidad de cultivar la multipli-cidad de misiones accesorias —pero no menos importan-tes— que la ley universitaria y la costumbre le han reco-nocido a nuestro primer centro docente.
Ciertamente —y como bien indica la opinión disidente— el estudiante no es un “ente pasivo” que se limita a la fun-ción mecánica de estudiar y enriquecer su intelecto. Coin-cidimos que nuestra Universidad le debe proveer al estu-diante un escenario adecuado que faculte el desarrollo de su carácter moral, la definición de concepciones particula-rizadas de los diferentes matices de nuestra vida política, social y económica, y la incorporación a su esencia como ser humano de “un intercambio activo y una educación diná-mica” que propenda al desarrollo de su persona como po-tencial “líder del mañana”. Sin embargo, no reconocer lí- *473 mite alguno al derecho a la libertad de expresión de los estudiantes favorece resultados adversos a los postulados nobles que la opinión disidente sugiere que nuestra Uni-versidad debe aspirar a ser. El acto de enclaustrar nuestro recinto por largos periodos de tiempo y el vindicar mani-festaciones estudiantiles que impidan el acceso de los miembros de la comunidad universitaria a nuestra institu-ción docente, impide que ésta alcance misión alguna de las reconocidas por la ponencia minoritaria.
En la opinión disidente no encontramos contestación a las interrogantes siguientes: ¿Con una Universidad ce-rrada se puede enseñar?; ¿con una Universidad cerrada se puede desarrollar “un intercambio activo y una educación dinámica”?; ¿con una Universidad cerrada los diferentes componentes de la comunidad universitaria pueden surcar un progreso de diálogo y discusión ilustrada?; ¿con una Universidad cerrada el estudiante puede convertirse en un “ente activo” que logre “aprovecharse del valor educativo de toda gestión universitaria”?; ¿con una Universidad ce-rrada “producimos cultura y servimos al pueblo puertorri-queño”? La respuesta obvia es no.
Primordialmente la Universidad es una casa de estudios. Así lo reconoció el Juez Asociado ítigau en su opi-nión disidente en Pagán Hernández v. U.P.R., 107 D.P.R. 720, 753 (1978), al declarar lo siguiente:
La Universidad es la casa de estudios por excelencia y allí los valores primarios deben ser la calidad moral y la compe-tencia intelectual. La Universidad necesita un clima de paz y debe allí haber gran tolerancia para las ideas más dispares pero no para la violencia. La violencia es destructiva de la vida universitaria. (Enfasis nuestro.)
Como Tribunal, nos corresponde vindicar la misión pri-maria de la Universidad. Esto es, servir como centro peda-gógico y docente. Sólo así podemos garantizar que las mi-siones accesorias reseñadas por la ponencia disidente de la *474 Jueza Asociada Señora Fiol Matta alcancen su cumpli-miento.
III
Mediante las expresiones vertidas en este voto particular reafirmo mi visión de que nuestra sociedad es una de ley y orden. Indubitablemente, el derecho a la libertad de expresión no es licencia para la anarquía y mucho menos un instrumento para el atropello de los derechos de otros a beneficiarse del cúmulo de recursos que nuestro sistema universitario puede ofrecer. Mediante nuestra decisión no sacrificamos el derecho a la libertad de expresión de los estudiantes, sino que creamos un balance de intereses en-tre el derecho de éstos y el orden y la civilidad que garan-tizará la impartición de vida a la institución centenaria que representa nuestra Universidad de Puerto Rico.

 J. Ortega y Gasset, La Misión de la Universidad, Madrid, Alianza Editorial, 1930, pág. 21.

 Informe de la Comisión de Instrucción y Cultura de la Cámara, P. de la C. 353, 7 de diciembre de 1965, pág. 24.

 La Opinión del Tribunal, U.P.R. v. Laborde Torres y otros I, fue emitida el 13 de diciembre de 2010. En ese momento me acogí al término de diez días dispuesto en la Regla 5(b) de nuestro Reglamento. 4 L.P.R.A. Ap. XXI-A.

 Véanse: E. Fontánez Torres, El discurso legal en la construcción del espacio público: Las playas son públicas, nuestras, del pueblo, 20 Rev. Ciencias Sociales 42 (verano 2009); E. Fontánez Torres, La pretensión totalizadora del Derecho: juridifi-cación de controversias en Puerto Rico, Ponencia presentada en la Universidad de Buenos Aires, Instituto GIOJA, I Jornada para Jóvenes Investigadores de Derecho y Ciencias Sociales “Sociedad, Derecho y Estado en cuestión” de 29 de octubre de 2009.

 Recalco de entrada, quizás innecesariamente, que habré de referirme en esta Opinión solamente a expresiones y manifestaciones estudiantiles pacíficas. No en-doso los actos violentos que puedan llevar a cabo ciertos individuos, estudiantes u otros, aprovechando esos eventos.

 32 L.P.R.A. Ap. V.

 J.A. Cuevas Sergarra, Tratado de Derecho Procesal Civil, San Juan, Pubs. JTS, 2000, T. II, pág. 1066.

 íd. Véase, además, M. Velázquez Rivera, Redescubriendo el Injunction, 1 (Núm. 1) Forum 18-22 (enero-marzo 1958).

 D. Rivé Rivera, Recursos Extraordinarios, 2da ed., San Juan, Prog. Educ. Jur. Cont. U.I.P.R., 1996, pág. 47.

 Alemite MFG Co. v. Staff, 42 F.2d 832, 833 (2do Cir. 1930).

 Véanse: Rivera Castillo v. Mun. de San Juan, 130 D.P.R. 683 (1992); Cuadrado Carrión v. Romero Barceló, 120 D.P.R. 434, 448 (1988). No obstante, recorde-mos que al aquilatar el valor persuasivo de la jurisprudencia interpretativa de un estatuto, adoptado en parte o en su totalidad de otra jurisdicción, siempre es nece-sario tomar en cuenta, de manera principal, los principios que rigen nuestro ordena-miento jurídico. Arce Bucetta v. Motorola, 173 D.P.R. 516 (2008). Véanse, además: P.R. Fuels, Inc. v. Empire Gas Co., Inc., 149 D.P.R. 691 (1999); Peña Clos v. Cartagena Ortiz, 114 D.P.R. 576 (1983).

 “(d) Contents and Scope of Every Injunction and Restraining Order.
“(2) Persons Bound. The order binds only the following who receive actual notice of it by personal service or otherwise:
“(A) the parties;
“(B) the parties’ officers, agents, servants, employees, and attorneys; and
“(C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).” Fed.Rules Civ.Proc. Rule 65(d)(2), 28 U.S.C.A.

 Chase Nat’l Bank v. Norwalk, 291 U.S. 431, 436 (1934).

 Regal Knitwear Co. v. Board, 324 U.S. 9, 14 (1945). Véase, además, Nat’l Spiritual Assembly of the Bahá’ís Under the Hereditary Guardianship v. Nat’l Spiritual Assembly of the Bahá’ís, 2010 WL 4721593 (7mo Cir. 2010), donde se expuso lo siguiente: “the ‘legal identity’justification for binding nonparties is limited to those who have notice of the injunction and are so closely identified in interest with the enjoined party that it is reasonable to conclude that their rights and interests were adjudicated in the original proceeding.”

 Black’s Law Dictionary, 9na ed., St. Paul, Ed. West, 2009, pág. 1320.

 Según indica el texto citado, las uniones obreras son la excepción a la regla. Para un análisis sobre la falta de estructura formal de los movimientos sociales, véase J. Raschke, Sobre el concepto de movimiento social, 69 Rev. Zona Abierta 121 (1994). Éste define el mismo como un “actor colectivo” que no constituye un simple medio del cambio social, como tampoco “la pasiva expresión de tendencias sociales de cambio, sino que, en mayor medida, son actores que se involucran activamente en el curso de las cosas con el fin de influir sobre ese desarrollo”. Id., pág. 123. También los destaca, particularmente, por su amplitud que rebasa cualquier organización en la cual pueden actuar o ser representados. Id., pág. 126.

 Art. 3.4 del Reglamento General de Estudiantes de la Universidad de Puerto Rico, Reglamento Núm. 7733, Departamento de Estado, 9 de septiembre de 2009.

 NBA Properties, Inc. v. Gold, 895 F.2d 30, 33 (1er Cir. 1990). Véanse, además: G.C. Merriam Co. v. Webster Dictionary Co., 639 F.2d 29, 35 (1er Cir. 1980); United Pharmacal Corp. v. United States, 306 F.2d 515, 517 (1er Cir. 1962); Alemite MFG Co. v. Staff, supra.

 11A Wright, Miller and Kane, Federal Practice and Procedure: Civil 2d Sec. 2956, págs. 341-342 (1995).

 Regal Knitwear Co. v. NLRB, supra, pág. 13. Véanse: Golden State Bottling Co. v. NLRB, 414 U.S. 168, 180 (1973); Chase National Bank v. Norwalk, supra, págs. 436-437; Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 234 (1917). Además, véase Nat’l Spiritual Assembly of the Baha’is Under the Hereditary Guardianship v. Nat’l Spiritual Assembly of the Baha’is, supra, pág. 1, donde se expone lo siguiente: “The ‘legal identity’ component of this rule often operates to bind a party’s successors and assigns, and sometimes other nonparties as well, but only when doing so is consistent with due process.”

 U.P.R. v. Laborde Torres y otros I, 180 D.P.R. 253, 304 (2010).

 32 L.P.R.A. sec. 3522; E.L.A. v. Asoc. de Auditores, 147 D.P.R. 669, 680 (1999); Misión Ind. P.R. v. J.P. y A.A.A., 142 D.P.R. 656, 698 (1997), opinión de conformidad del Juez Asociado Señor Hernández Denton; Delgado v. Cruz et al., 27 D.P.R. 877, 880 (1919). Véase, además, Rivé Rivera, op. cit., pág. 23.

 R. Hernández Colón, Práctica jurídica de Puerto Rico: derecho procesal civil, San Juan, Ed. LexisNexis de Puerto Rico, 2010, pág. 528. Véase, además, Trigo Hnos. v. Sobrino de Izquierdo, 72 D.P.R. 449 (1951); Las Monjas Racing Corp. v. Com. Hípica, 67 D.P.R. 45 (1947).

 “An improvidently secured injunction may have the effect of polarizing resistance to university discipline. Improper resort to the injunction for purposes of restraining the exercise of First Amendment freedoms may result in lower court denials or appellate court reversals embarrassing to the university, and may contribute to the argument of dissidents that the university does not respect basic constitutional rights.” Report of the American Bar Association Commission on Campus Government and Student Dissent, ABA Foundation, Chicago, 1970, pág. 28.

 Independientemente de los sucesos concretos que operan como catalítico de los conflictos universitarios, éstos pueden explicarse por la conjunción de diversos factores, entre ellos “las tensiones provenientes del contexto económico-social del país” y “los sentimientos de alienación que abonan al descontento estudiantil ante un aparato institucional y una ‘comunidad universitaria’ de los cuales no logran sentirse parte cabalmente”. L. Nieves Falcón y otros, Huelga y sociedad: análisis de los suce-sos en la U.P.R. 1981-1982, Río Piedras, Ed. Edil, 1982, pág. 27.

 E. Rivera Ramos, La Universidad y lo Posible, 78 (Núm. 3) Rev. Jur. U.P.R. 643, 659 (2009).

 Informe de la Comisión de Instrucción y Cultura, supra, pág. 14.

 18 L.P.R.A. see. 601 et seq.

 18 L.P.R.A. sec. 601(a)(1) y (2).

 Informe de la Comisión de Instrucción y Cultura, supra, pág. 5.

 18 L.P.R.A. sec. 609(a). Cabe resaltar que nuestra jurisprudencia no ha tenido muchas oportunidades para interpretar la naturaleza de la “casa de estudios”. Sin embargo, en Pagán Hernández v. U.P.R., 107 D.P.R. 720, 753 (1978), el Juez Asociado Rigau expresó en su opinión disidente lo siguiente: “[l]a Universidad es la casa de estudios por excelencia y allí los valores primarios deben ser la calidad moral y la competencia intelectual.” (Enfasis nuestro.)

 Castle Enterprises, Inc. v. Registrador, 87 D.P.R. 775, 788-789 (1963).

 Rivera Ramos, supra, pág. 659.

 32 L.P.R.A. sec. 2761.

 Dichos señalamientos fueron a los efectos que debía revocarse el dictamen porque: (a) “erró manifiestamente el TPI [sic] al concluir que la causa de acción de injunction permanente se torno [sic] en académica toda vez que el cese voluntario de la conducta de los demandados no tiene carácter de permanencia”, y (b) “erró mani-fiestamente [el] TPI [sic] al concluir que la amenaza de huelga en un futuro cercano es incierta toda vez que los demandados no cumplieron con su obligación [sic] de establecer que no hay expectativa razonable de que no habrá otra huelga próximamente”. Recurso de apelación ante el Tribunal Supremo, 13 de julio de 2010, pág. 13.
La controversia sobre el derecho a la libertad de expresión de los estudiantes se planteó por primera vez en el Recurso de Certificación Intrajurisdiecional, presen-tado por la Administración ante este Tribunal el 14 de julio de 2010. Éste indica que “este caso le brinda a este Honorable Tribunal una oportunidad propicia para dar respuestas a interrogantes constitucionales sustanciales que han sido objeto de debates sociales y académicos por décadas: ¿puede un grupo de estudiantes, so pretexto de ejercer su derecho de libertad de expresión, tomar el control de la UPR? ¿Está tutelado por el derecho de libertad de expresión el que estudiantes tomen por asalto los portones y accesos de la UPR para llevar a cabo una protesta estudiantil? ¿Qué limites [sic] pueden imponerse al ejercicio de tal derecho en este contexto?”. íd., págs. 1-2. Este planteamiento, a su vez, responde a que uno de los codemandados, en su Contestación a Demanda, expresó que "los remedios solicitados por la parte deman-dante ... implican un menoscabo de patente intensidad de derechos constitucionales fundamentales de los co-demandados”. Apelación de 13 de julio de 2010, pág. 6.
La opinión mayoritaria reconoce en su ponencia que la Administración le requi-rió que se pronunciara sobre este aspecto y con ello explica la inclusión de este tema, considerando que “será imprescindible limitar la actividad expresiva para que ésta sea cónsona con los propósitos pedagógicos del recinto académico”. U.P.R. v. Laborde Torres y otros I, supra, pág. 306.
Ciertamente, las preguntas que nos hace la Administración en su Recurso de Certificación deben ser objeto de un debate social y académico, pero ello no significa que constituyan, por consiguiente, una controversia jurídica que se debe resolver en esta etapa del trámite judicial, máxime cuando no fue planteada ante el foro primario.

 Véanse: Suárez v. C.E.E. V, 163 D.P.R. 541 (2004); Ortiz v. Panel F.E.I., 155 D.P.R. 219 (2001); Martínez v. Registrador, 54 D.P.R. 7 (1938); P. & G.R.R. Co. v. Antonetti et al., 17 D.P.R. 325 (1911).

 U.P.R. v. Laborde Torres y otros I, supra, págs. 313 y 314.

 31 L.P.R.A. secs. 2991, 2992, 2994, 3371, 3372, 3375 y 3391.

 Cabe resaltar que la acción en daños y perjuicios instada por el demandante se dividía en tres reclamos: “educational malpractice for not educating him, a new tort of ‘negligent admission’ to an educational institution, and negligent infliction of emotional distress.” Ross v. Creighton University, 957 F.2d 410, 413-414 (7mo Cir. 1992).

 Citando a Lyons v. Salve Regina College, 565 F.2d 200, 202 (1er Cir. 1977).

 U.P.R. v. Laborde Torres y otros I, supra, pág. 313.

 Sin embargo, en Andersen v. Regents of University of California, 22 Cal.App.3d 763 (1972), el tribunal incluyó unas expresiones muy interesantes en cuanto a su interpretación de la naturaleza de la relación contractual del estudiante con la Universidad Pública: “A contract is created with the state which, by its very nature, incorporates constitutional principles of due process. Attendance at a publicly financed institution of higher education is to be regarded, as a benefit somewhat analogous to that of public employment.” (Énfasis nuestro.) Id., pág. 770.

 Reglamento General de Estudiantes de la Universidad de Puerto Rico, supra, Art. 3.4, pág. 14.

 Este principio de diálogo es ampliamente reconocido en el proceso de toma de decisión universitario. De esa forma, Corson se refiere a "the process or art with which scholars, students, teachers, administrators, and trustees associates together in a college or university establish and cariy out the rules and regulations that minimize conflict, facilitate their collaboration, and preserve essential individual freedom”. (Énfasis nuestro.) J. J. Corson, Governance of Colleges and Universities, Nueva York, McGraw-Hill Book Company, 1960, págs. 12-13.

 Fontánez Torres, supra, pág. 46.

 L. Martín-Retorquillo Baquer, La cláusula de orden público como límite —impreciso y creciente— del ejercicio de los derechos, Madrid, Ed. Civitas, 1975, pág. 11.

 Véase V. Soto Martínez, El derecho a la protesta y su expresión normativa, en www.congresoconstitucional.cl/wp-eontent.. ,/08/victorsoto_1252892663.pdf (última visita 28 de diciembre de 2010).

 Gregory v. Chicago, 394 U.S. 111, 124-125 (1969), opinión concurrente.

 Opinión disidente de la Jueza Asociada Señora Fiol Matta, pág. 449 esc. 25.

 Además, la Opinión disidente enuncia que el injunction permanente que en su día podría emitir el Tribunal de Primera Instancia según los postulados de la Regla 57.5 de Procedimiento Civil de 2009 (32 L.P.R.A. Ap. V), y conforme a lo esta-blecido en la opinión mayoritaria circulada el 13 de diciembre de 2010, es muy am-plio en su ámbito de aplicación, englobando bajo su mandato a toda una comunidad de estudiantes universitarios que no forman parte del presente pleito. Debido a que la opinión mayoritaria se limitó a los hechos alegados en el caso que nos ocupa y a las partes emplazadas, no vemos necesidad alguna de divagar en ejercicios especulativos sobre la aplicabilidad o no de un “injunction” a terceros. El uso del término “estu-diantes” en la opinión mayoritaria se limitó a la exposición del derecho aplicable que servirá de guía al Tribunal de Primera Instancia una vez se remita el caso a éste para su debida atención. Tal exposición del Derecho puede utilizar términos inclusivos, como lo es la palabra “estudiantes”, toda vez que la norma jurídica enunciada cons-tituye el precedente judicial aplicable a casos de esta naturaleza.